# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | | |
|---|---|---|
| WILLIAM PADULA, Administrator of the Estate of Jerome Clement, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CAUSE NO.: 2:07-CV-35 JVB |
| TIMOTHY LEIMBACH, JESUS ARCEO, N. LONDON Officer #136, M. HARRETOS, Officer #127, CITY OF EAST CHICAGO, EAST CHICAGO POLICE DEPARTMENT, ANGELO MACHUCA, JR., Chief, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Jerome Clement, an insulin dependent Type I diabetic, took a morning break from his work to visit his home. On the way back to work, he became hypoglycemic and turned into the parking lot of a scrap yard. There, he drove the wrong way onto a truck scale and stopped, clogging the work traffic. When the workers asked him to move, he became unresponsive and muttered gibberish. Police was called and a struggle ensued when the responding officers, who suspected drunkenness or drug use, tried to remove him from the car and restrain him. During the scuffle, Jerome lost consciousness and paramedics, who were now at the scene, determined that he was suffering from hypoglycemia. He was rushed to the hospital on life support, where he died two days later.

As a result, the administrator of Jerome's estate, William Padula, sued the responding officers, the City of East Chicago, and the Police Chief. Mr. Padula in Lake Superior Court. Plaintiff maintains that the Defendants are liable under the state law theories of negligence and

intentional conduct resulting in wrongful death, negligent hiring, training, and supervision. In addition, he claims that the Defendants violated Jerome's civil rights under the federal constitution and the Indiana constitution by using and condoning excessive force and by wrongfully arresting him. The Defendants removed the case to this Court and now move for summary judgment. The Court grants the motion in relation to Plaintiff's federal claims and remands the state law claims because it finds no compelling reason to adjudicate that which properly belongs in Indiana courts.

**A. Summary Judgment Standard**

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists.

*Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986).

**B. Facts**

As relevant here, the facts viewed in the light most favorable to Plaintiff are as follows:

Jerome Clement was an insulin dependent type I diabetic. He weighed 220 pounds and was 5'11" tall. Jerome lived with his grandmother, Phyllis Jordan, in East Chicago, Indiana. Jerome would periodically become hypoglycemic. During these episodes he would phase out and become unresponsive. He would also flail his arms but was not combative. If such episodes occurred at work, his coworkers would hold him down until Ms. Jordan, who lived nearby, could come and provide help.

On August 24, 2006, Jerome clocked in at work at 5:22 am. During his break at 9 am, Clement went home for about 15 minutes. On the way back to work, Jerome turned into the parking lot of Metal Management Company. From there, he drove the wrong way onto one of

the truck scales and stopped, clogging the work traffic. At this point, Jerome became unresponsive. Operations Manager James Strong screamed at him to move, but to no avail. Jerome appeared not to hear what Mr. Strong was saying and was muttering gibberish.

Channel Smith called 911 to report the incident. She indicated to the operator that an unresponsive person in the car was blocking their scales. In response to the operator's question, Ms. Smith said she did not know if the person was intoxicated. Peddlers, drunks, and drug users commonly visited Metal Management territory.

Before the police arrived, Jerome began driving forward and it seemed that he was going to run into a wall. However, a peddler reached in the car and removed the keys. The car stopped, and Jerome continued talking to himself incomprehensibly. He seemed to be frustrated and appeared to argue with himself. Eventually, he passed out at the wheel. Plant Manager Patrick Fritz saw part of the incident and thought that Jerome could be drunk or drugged.

Officers Jesus Arceo and Timothy Leimbach were the first officers to arrive, at 10:04 am. They were told by the dispatcher that their assistance was needed regarding an intoxicated man in a car at the scrap yard. The officers told Jerome to get out of the car but he remained unresponsive. The officers tried to wake him up by shaking him and asking if everything was alright. Jerome remained unresponsive and slouched over. Officer Arceo noticed that Jerome was very unkempt and that his car smelled like stale beer. Officer Leimbach likewise smelled alcohol in the car. Shortly after the arrival of Officers Arceo and Leimbach, Officer Nathan London, a canine handler, got to the scene.

Jerome woke up eventually. He opened his eyes, saw Officer Arceo, and kind of took a swing at him but missed. Officer Leimbach unbuckled Jerome. The officers grabbed him to pull

him out but he was not cooperating with them. The officers kept asking him to get out of the car, their voices getting progressively louder. Jerome remained incoherent and was yelling. He was stiff and kept flailing his arms. Eventually, the officers were able to pull him out of the car and he dropped to the ground. Jerome's legs were partially under the car and he was lying on his back. The officers tried to pull him out from under the car and to handcuff him but he kept resisting, flailing his arms in air. At this point, Officer Leimbach sprayed mace into Jerome's face but getting no reaction, he put the mace away. Jerome's eyes were closed and he kept resisting.

The officers managed to flip him onto his stomach but Jerome continued to ignore their commands to stop resisting and put his hands behind his back. Bystanders saw that his eyes were rolled back and that he was foaming at the mouth. His arms and legs flailed while his head moved up and down. His face hit the pavement and he began bleeding from his head. One of the witnesses, Robert Pena, thought that Jerome might have been having a seizure. In fact, Pena did not think that Jerome was consciously fighting the officers. During the struggle, Officer London's remote control accidentally activated his squad car door and the dog got out. The dog was ran around barking but did not attack Jerome.[1]

---

[1]Plaintiff represents in his Response brief that Officer London ordered the dog to bite Jerome. Such contention is not supported by the record. Robert Pena, who alluded to the orders, was not so sure after all as to what happened:

Q.  What do you remember happening next?
A.  I remember an officer pulled up—it was the canine unit. The officer gout out of the vehicle with his dog—it was an African-American officer, I do remember that.
    And basically they were talking to the guy and telling him to stop moving, or they were going to sic [sic] the dog on him, and he was still flailing around like he was. The officer, he ordered the dog, you know, to bite him.
    He kind of just said—I don't remember exactly what he said, but the dog wasn't really—he was playing around like he wanted a treat or something, so he really—he didn't bite—he didn't bite him.
Q.  Even though the officer ordered him to do it?
A.  I don't remember exactly his exact words. I just remember, you know, he told him, if you don't stop moving around—you know, we have a dog here. And the next think you know, whatever he told the dog—that was maybe his command—and the dog—he was just running around, running around him, but he was playing.

The officers managed to cuff one hand. While they were trying to cuff the other hand, one officer struck Jerome's arm with a baton. During the scuffle, Officer Leimbach struck Jerome's leg with the baton three times and then pinned the leg. For a moment, one of the officers had his knee on Jerome's head, holding him in a prone position: Officer Arceo held the top of Jerome's body; Officer Leimbach kept Jerome's shoulder blades down; and Officer London held the torso. At some point during the struggle, Officer Arceo called for an ambulance.

Eventually, the officers were able to get the second handcuff on but had to keep Jerome down as he was trying to get up. Jeromes' hands were behind his back. Officer Harretos arrived and took over for Officer London, who returned the dog to the car. Jerome was still trying to get up and Officer Harretos maced him in the eyes. The other two officers then told him that they had already maced him and it had not worked. Officer Harretos was positioned in the middle of Jerome's back. Jerome was yelling and screaming but no one could make out what he was saying. Officer Harretos did not smell alcohol on Jerome.

As the officers were holding Jerome down, his face began turning blue. At this time (10:22 am), Paramedic Frank Torres arrived in an ambulance. Torres saw Jerome lying kind of on his right shoulder but with his face down towards the left. Jerome was still combative and the three officers were holding him down with their hands. He told the officers to get off Jerome. Torres checked Jerome's blood sugar but the officers had to keep restraining his right arm because he was still struggling. Torres did not smell alcohol on Jerome. The test showed that Jerome had low blood sugar. Jerome was breathing rapidly and his hands were pale. Torres administered an IV injection Dextrose at 10:27 am and a second dose a minute later. After the

---

He didn't even—he, I guess, wasn't doing his job. I don't know.

second dose, Jerome stopped breathing. At 10:29 am, Torres checked his vitals again, and found no pulse. Torres then instructed the officers to remove the handcuffs so that Jerome could be placed in the ambulance. Jerome was rolled over and an oral airway was inserted to ventilate him. The ambulance took Jerome to the hospital. On the way to the hospital, he was resuscitated and regained a strong pulse.

At the hospital, Officer Leimbach was given Jerome's wallet, which had been found in Jerome's back pocket. The wallet contained a diabetic warning card.

Dr. Kai Hsu was working at St. Catherine's emergency room when Jerome was brought in. Dr. Hsu intubated Jerome and put him on a mechanical ventilator. Dr. Hsu diagnosed Jerome with acute cardiac respiratory failure, severe hypoglycemia, and severe metabolic and respiratory acidosis. At the hospital, Jerome's condition improved , requiring Dr. Hsu to prescribe sedatives because he kept becoming restless and combative. Dr. Hsu tested Jerome's blood for narcotics because of his altered state of mind. The test was positive for marijuana. In addition, the test indicated a low presence of alcohol which suggested that Jerome may have had a drink. Jerome remained on the ventilator from the time of his arrival at the hospital, but the doctors were unable to save him. He died at 3:11am on September 28, 2006.

The Lake County Coroner ruled that the manner of Jerome's death was natural and that the cause of death was insulin dependent diabetes mellitus with insulin reaction and profound hypoglycemia, hypoxic encephalopathy,[2] respiratory failure with ventilator, and renal failure.

---

[2]Damage to cells in the central nervous system (the brain and spinal cord) from inadequate oxygen. (www.medterms.com/script/main/art.asp?articlekey=3875 last visited on September 1, 2010).

## C. Federal Claims

**(1)** *Section 1983 Standard*

Plaintiff brings two claims under 42 U.S.C. § 1983: arrest without probable cause and the use of excessive force, both in violation of the Fourth Amendment to the U.S. Constitution.

Section 1983 provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterrey v. Del Monte Dunes at Monterrey, Ltd.*, 526 U.S. 687 n.9 (1999). A cause of action may be brought under § 1983 against "[e]very person who, under color of statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction therefor to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

The plaintiff must demonstrate that the defendant personally participated in or directly caused the deprivation of his or her rights. *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003). The doctrine of *respondeat superior* cannot be used under § 1983 to create liability for supervisors due to the misconduct of subordinates. *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001). Instead, the plaintiff must demonstrate that the defendant was personally responsible by "act[ing] or fail[ing] to act with a deliberate or reckless disregard of plaintiff's constitutional rights," or that "the conduct causing the constitutional deprivation occur[red] at [the defendant's] direction or with [the defendant's] knowledge or consent." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982).

Qualified immunity, a primary defense to a claim under § 1983, shields officers from liability when they are "performing discretionary functions . . . insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[T]he inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question." *Delaney v DeTella*, 256 F.3d 679, 686 (7th Cir. 2001). Qualified immunity provides "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "[P]laintiff bears the burden of showing the existence of the allegedly clearly established constitutional rights." *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996).

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government is responsible under § 1983." *Monell v. Dep't of Soc. Services of City of N.Y.*, 436 U.S. 658, 694 (1979). A municipality will only be held liable when its official policy or practice causes a constitutional violation. *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994). Accordingly, a plaintiff must show at least one of three things:

> (1) an express policy that, when enforced, causes a constitutional deprivation (2) a widespread practice that, although not authorized by written law or express municipal policy, is permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006).


**(2)** *Jerome's Arrest*

Plaintiff argues that Defendant police officers had no probable cause to arrest Jerome. Plaintiff suggests that, had the officers investigated the situation more, they would have found

9

Jerome's diabetic card in his back pocket and the diabetic kit in the car. In short, Plaintiff insists that no trustworthy information existed from which the officers could have concluded that Jerome has committed or was committing an offense.

Defendants concede that Jerome was arrested. However, they argue that the officers reasonably believed that Jerome was driving his car while intoxicated and, therefore, the arrest was not wrongful.

"Probable cause is an absolute defense to a claim of wrongful arrest asserted under section 1983 against police officers." *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008).

> A police officer has probable cause to arrest if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. In determining whether an officer had probable cause, the court steps into the shoes of a reasonable person in the position of the officer.

*Id*. (citations, quotation marks and ellipsis omitted).

> The on-the-spot determination often requires an exercise of judgment, which turn[s] on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. In recognition of the endless scenarios confronting police officers in their daily regimen, courts evaluate probable cause not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the position of the arresting officer—seeing what he saw, hearing what he heard. In practice, then, it can be said that [p]robable cause—the area between bare suspicion and virtual certainty—describes not a point but a zone, within which reasonable mistakes will be excused.

*Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994) (citations, quotation marks and ellipsis omitted). Probable cause questions typically get resolved by the jury "though a conclusion that probable cause existed as a matter of law is appropriate when there is no room

for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Id*. "Critically, the probable cause analysis is an *ex ante* test: 'the fact that the officer later discovers additional evidence unknown to her at the time of the arrest is irrelevant as to whether probable cause existed at the crucial time.'" *Smith v. Ball State Univ.*, 295 F.3d 763, 669–70 (7th Cir. 2002) (quoting *Qian v. Kautz*, 168 F.3d 949, 954 (7th Cir. 1999).

The Court agrees with Defendants that the officers had probable cause to arrest Jerome for driving while intoxicated and, as the situation escalated, for resisting an officer while he was performing duties in his official capacity. Both Officer Arceo and Officer Leimbach were dispatched to the scrap yard regarding a suspected intoxicated trespasser behind the wheel. While this premise turned out to be wrong, there is nothing in the record to suggest that the officers should have known better. From the moment Jerome blocked the truck traffic on the scales and until the ambulance arrived, his actions were consistent with those of an intoxicated man. In fact, there is no indication that any bystander suspected a medical condition until he was already on the ground and his eyes were rolling back and he seemed to be having a seizure. From the beginning, Jerome was disoriented in his own car; he muttered gibberish and talked to himself incomprehensibly; he almost ran his car into a wall; he passed out at the wheel; he did not respond to the officers and ignored their commands to get out of the car; he looked unkempt and the car smelled of alcohol; and he screamed, yelled, and resisted the officers when they were trying to remove him from the car. At no point did Jerome tell them that he was a diabetic.

Plaintiff insists that the officers should have investigated more to find out about Jerome's condition. Plaintiff essentially argues that the officers should have had virtual certainty before acting on their suspicions. Yet, such is not the law under Fourth Amendment jurisprudence. As

explained above, "probable cause —the area between bare suspicion and virtual certainty—describes not a point but a zone, within which reasonable mistakes will be excused." *Sheik-Abdi*, 37 F.3d at 1246. The undisputed facts show that the officers spent a sufficient period of time attempting to speak with Jerome to form the impression that Jerome was driving while intoxicated, which is a crime in Indiana. *See* Ind. Code § 9-30-5-2. Unfortunately, they were wrong, but their mistake was reasonable. Moreover, it is undisputed that Jerome did not respond to the officers' requests to get out of the car, thus justifying his arrest for resisting or obstructing their lawful authority. *See* Ind. Code § 35-44-3-3.

In support of his contentions, Plaintiff relies on *Baxter v. Marion County Sheriff*, 2002 WL 392818 (S.D. Ind. 2002). In *Baxter*, the district court denied defendants' motion for summary judgment, and Plaintiff believes that the facts of that case compel the same conclusion here. The Court respectfully disagrees. In *Baxter*, police responded to a phone call about a man with a mental disability pacing back and forth in front of a residence for three hours. The caller informed them that the man posed no danger and appeared to be confused. When the officers arrived, the man told them that he was trying to get into a home where he lived with his mother but the door was locked and his mother was inside unable to open it. The man, who was unable to recall his home phone number and address, had a piece of paper with the directions to his home. He also told the officers who he was and explained to them that an agency serving mentally handicapped persons had brought him there. Despite the man's assertions that he was trying to get into his own home, the officers arrested him under Indiana's Immediate Detention statute which allows police to transport a mentally challenged person in trouble to a hospital for an evaluation. Faced with these facts, the district court denied the defendant's motion for

12

summary judgment because the officers knew that the man was mentally ill, he was locked out of the house, he cooperated with the police, and had put up no resistance. *See Baxter*, 2002 WL 392818, *9.

*Baxter*'s facts are different from the situation at hand: neither Officer Arceo nor Officer Leimbach knew that Jerome was a diabetic; Jerome was trespassing private on property and exhibited symptoms of intoxication; he neither spoke nor cooperated with the officers; and he resisted their orders to get out of the car. Accordingly, Plaintiff's reliance on *Baxter* is misplaced.

Intertwined with the probable cause issue is the question of whether the City of East Chicago violated Jerome's civil rights by failing to adequately train the officers to recognize the symptoms of diabetes and distinguish them from the symptoms of intoxication. Although he has raised this allegation, Plaintiff has failed to show that the City's failure to train, if any, "reflects deliberate indifference to the constitutional rights of its inhabitants." *City of Canton v. Harris*, 489 U.S. 378, 392 (1989). "What this means in the present context is that before these defendants may be deliberately indifferent to the constitutional rights of diabetics, [Plaintiff] had to show that the defendants were on notice of a pattern of constitutional violations resulting from the inadequate training of the police . . . in recognizing diabetic shock. This notice of violations would have to show that the failure to provide further training was tantamount to a deliberate or conscious decision on the part of the defendants to allow the violations." *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994). Plaintiff has presented no facts to support such a conclusion.

**(3) *The Manner of Jerome's Arrest***

Plaintiff argues that the officers used excessive force in arresting Jerome. Despite Officer Arceo's and Officer Leimbach's testimony, Plaintiff claims that Jerome did not smell of alcohol when he was seated in the car. Furthermore, according to Plaintiff, Jerome was nonresponsive and noncombative and was trying to get out of the car. Plaintiff argues that Officers Arceo, Leimbach, London, and Harretos used unnecessary force to handcuff Jerome once he was lying on the payment.

"[A]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotation marks omitted). "Due to the fact-specific nature of the inquiry, the determination whether a police officer utilized excessive force depends on the totality of the circumstances surrounding the encounter." *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997). The Supreme Court requires that the courts give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* In addition, the calculus of reasonableness must allow "for the fact that police

officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. Finally, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*.

As discussed above, Officers Arceo and Leimbach came to the scrap yard believing that an intoxicated driver was obstructing Metal Management's business operations. Upon arrival, the officers' suspicions appeared to be valid, giving them cause to ask Jerome to get out of the car. In fact, even without probable cause, the officers were justified in ordering Jerome to get out of the car, as they were still investigating the situation. *See Smith*, 295 F.3d at 769 ("[P]olice officers are permitted to order a driver to exit his or her car during the course of an investigatory stop."). "This rule comports with the Fourth Amendment's reasonableness requirement for obvious reasons. An officer who confronts a potentially intoxicated driver must have the discretion—without probable cause—to order the individual out of the vehicle. Anything less would allow an unfit driver to retain control of his or her car." *Id*.

When Jerome ignored the officers' repeated commands to get out, the circumstances warranted that they physically extract him from the automobile. Plaintiff's contention that Jerome posed no danger and that he, therefore, should have been allowed to remain in the car, are without basis. Plaintiff is assuming that the officers should have known that Jerome's condition was caused by diabetes, not intoxication. Yet, no evidence exists from which the Court could infer that the officers should have been aware of Jerome's diabetic condition. In addition,

15

Plaintiff ignores the fact that, just minutes before the officers arrived, Jerome was obstructing the scrap yard traffic and almost ran his car into a wall. Moreover, Jerome's unresponsiveness, contrary to Plaintiff's assertions, did not neutralize the safety threat but exacerbated it by adding an element of unpredictability. *Cf. Smith*, 295 F.3d at 769 (evaluating police actions in forcibly removing from his car a person in diabetic shock who drove onto a sidewalk, barely missing pedestrians). Therefore, Officers Arceo and Leimbach acted reasonably when, believing that Jerome was intoxicated, they attempted to remove him from the car.

Unfortunately, because of Jerome's resistance, the situation escalated to the point where the officers had to use mace and to subdue him on the ground. However, here too, faced with an essentially fluid situation, the officers were "entitled to graduate their response to meet the demands of the circumstances confronting them." *Id.* at 770. Once Jerome was out of the car, he was on his back with his legs partially under the car. He kept screaming and yelling unintelligibly and flailing his arms about. To stop him, Officer Leimbach sprayed mace in Jerome's face, but that had no effect. Officer Leimbach then put the mace away and began, with the help of Officer Arceo, to roll Jerome onto his stomach so that they could cuff his hands behind his back. At some point they managed to pull him out from under the car and flip him over. At this point, Officer London had arrived and began assisting them. Jerome was a strong man and kept evading the handcuffing even as the three officers were trying to hold him down. The witnesses agree that at some point one of the officers was straddling Jerome around his buttocks area to keep him down. Also, the facts show that the other two officers were holding down his upper and lower body as well, and one of the officers had his knee on Jerome's head to prevent him from moving it up and down. Although during the struggle, Officer London's

automatic door opener was activated and the dog jumped out of the car, the dog did not get involved in the struggle except for some barking. When Officer Harretos arrived, he replaced Officer London and held Jerome's legs. Officer Harretos maced Jerome again, but was told by the other two officers that they had already maced him and it had not worked. As the officers struggled to put on the handcuffs, one officer struck Jerome's arm with a baton and officer Leimbach struck Jerome's leg with the baton three times to get hold of his kicking legs.

    In these circumstances, the officers' use of force was reasonable. The use of the batons was minimal and not gratuitous, but was intended to subdue Jerome's resistance, who posed serious danger to himself, the officers, and others in the area. Likewise, straddling his back to keep him down from getting up was reasonable as was the knee on the head to keep Jerome from bobbing his head up and down. Neither did the officers exceed their bounds by using the mace. Officer Leimbach used his mace early in hopes of preventing the situation from escalating. Officer Harretos used it minutes later in hopes of getting the handcuffs on, but without any knowledge that it just had been used without success. While the struggle was intense, there is no indication that the officers used their force viciously or that their actions got out of control. Also, while the bystanders observed Jerome's eyes rolling back and foam around his mouth suggesting that he was suffering a medical condition, no evidence exists that the officers saw or should have seen the same. In any case, once Jerome was out of the car, the officers were justified in subduing him no matter what the cause of his resistance and potential danger to others was. In fact, Jerome had to be held down even for the glucose check and he did not completely stop resisting until he lost consciousness. Therefore, this case is different from cases where there were questions of fact as to the reasonableness of the officers' actions. *See e.g.*, *McAllister v. Price*, ---

F.3d ----, 2010 WL 3169326, 6 (7th Cir. August 12, 2010) ("[Officer] ignored obvious signs of [plaintiff's] medical condition, pulled him out of the car, and took him to the ground with such force that [plaintiff's] hip was broken and his lung bruised from the force of [officer's] knee in his back, not because such force was necessary but because [officer] was "angry" with [plaintiff]. Even if [officer] was justified in using some force to remove [plaintiff] from the vehicle, using the force involved here against a non-resisting suspect could have been unreasonable given the circumstances.").

Plaintiff contends that placing Jerome in a prone position was in itself a sign of excessive force. Yet the Seventh Circuit Court of Appeals has long held that "[r]estraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997). Even if Plaintiff could show that the prone position contributed to his eventual death, "the question is not whether the officers' actions aggravated an undiscovered injury or condition, but whether their actions were objectively reasonable under the circumstances." *Id.* As discussed above, the reasonableness of the force must be evaluated in light of objective circumstances, and here the circumstances justified keeping Jerome on the ground in a face down position. Likewise, Jerome's death cannot be viewed as res ipsa loquitor of the officers' liability. Absent any evidence to prove that the officers were unreasonable in their handling of Jerome, the reasonableness question may not be submitted to a jury. *Id.* at 594.

Having decided that Defendant officers did not violate the Fourth Amendment, the Court must conclude that neither the City of East Chicago nor Chief Machuca can be held liable for Jerome's death. *Id*. at 596–97. Likewise, the Court need not decide the question of qualified

immunity. *Id.* at 597.

**D. State Claims**

This case was first filed in state Court and removed here on the basis of Plaintiff's constitutional claims. Having found that Defendant is entitled to judgment as a matter of law on Plaintiff's federal claims, this Court has discretion whether to address Plaintiff's state law claims. *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1043 (7th Cir. 1998) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988)). "When the district court dismisses all federal claims before trial, the usual and preferred course is to remand the state claims to the state court unless there are countervailing considerations." *Id.* No such considerations exist here, and Plaintiff should be given the opportunity to finish his litigation regarding the state claims in the state court, where he intended to be in the first place. Moreover, a remand will not cause any substantial duplication of effort. Therefore, Plaintiff's remaining state law claims are remanded to the Lake Superior Court.

**E. Conclusion**

The Court grants in part and denies in part the Defendant's Motion for Summary Judgment (DE 53). Summary Judgment is granted in favor of all Defendants on all issues involving Plaintiff's federal claims. The Court remands to Lake Superior Court the remaining state law claims.

SO ORDERED on September 14, 2010.

   S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE